Rodríguez de Oronoz, Jueza Ponente
*1103 TEXTO COMPLETO DE LA SENTENCIA
Comparece ante nos la parte codemandada Tech Studios t/c/c Tec Studios o Tec Color Lab, Inc. (en adelante, Tech Studios) por medio del recurso de epígrafe, presentado el 23 de agosto de 2002. Se nos solicita revoquemos la sentencia parcial notificada por el Tribunal de Primera Instancia el 24 de julio de 2002, en la que el foro de instancia declaró nulo el contrato de compraventa de dos inmuebles, suscrito entre los codemandados, Tech Studios y el Sr. Carlos Mattei. El tribunal de instancia concluyó, sumariamente, que entre el codemandado, Sr. Carlos Mattei y la apelada, Artic-Kar, Inc. (en adelante, Arrie) existía un precontrato de promesa bilateral de compraventa y que Tech Studios había advenido en conocimiento de dicha relación previo a la celebración de su contrato de compraventa por los mismos solares. Por tanto, el foro de instancia razonó que Tech Studios había incurrido en conducta culposa y dolosa al realizar el contrato de compraventa en daño a tercero e intervenir en la relación contractual existente entre el Sr. Mattei y la apelada, Arrie. En esencia, ordenó el cumplimiento específico de la obligación contraída entre el Sr. Mattei y Arrie, y determinó que ambos codemandados serían responsables por todos los daños y perjuicios que su conducta le hubiera causado a la demandante.
*1104 Examinados en su totalidad los autos del caso y el derecho aplicable, nos encontramos en posición de resolver el caso.
I
El 18 de junio de 1999, Artic presentó demanda contra el Sr. Mattei, el Ledo. Celso Suárez Alicea y la aquí apelante, Tech Studios. En dicha demanda, Artic adujo, entre otras cosas, que el 4 de febrero de 1998, había suscrito un contrato de promesa de compraventa con el Sr. Mattei mediante el cual éste se comprometía a venderle dos (2) solares, el Número ocho (8) y diez (10), localizados en la calle Guayama del municipio de San Juan, por el precio total de doscientos mil dieciocho mil dólares ($218,000.00). Dicho contrato fue denominado por las partes como un contrato de opción de compraventa (“Option to Purchase Contract”), el cual fuera anejado a la demanda. El texto de dicha escritura estipulaba que el contrato de compraventa de los solares involucrados debía ser firmada no más tarde del 30 de abril de 1998, sujeto a cambios por razones ajenas a la voluntad de las partes, en las que se incluyó el financiamiento y cumplimiento de otras condiciones accesorias asumidas por éstas. Asimismo, el contrato establecía que el Sr. Mattei debía entregar los solares sin edificaciones y libre de gravámenes. Por su parte, Artic estaba obligado a realizar un pago inicial de diez mil dólares ($10,000.00) al corredor de bienes raíces en calidad de depósito aplicable al precio total de la compraventa cuando se firmara la escritura.
El 13 de agosto de 1998, el Sr. Mattei se dirigió por escrito al Presidente de Artic informándole que el contrato de opción del 4 de febrero de 1998 había vencido y que los solares habían sido tasados por un valor mayor al indicado en dicho contrato. En respuesta a dicha carta, el 25 de agosto de 1998, la representación legal de Artic dirigió una misiva al Sr. Mattei en la que impugnaba lo aseverado por éste y sostenía que del contrato no surgía fecha de vencimiento y que, por el contrario, Artic había entregado cheque en satisfacción de la suma estipulada de diez mil dólares ($10,000.00) al corredor de bienes raíces para la compra de la propiedad en cuestión, por lo que sólo restaba otorgar la escritura pública para formalizar el negocio. Indicó, además, que Artic estaba dispuesto a culminar la compraventa tan pronto el Sr. Mattei cumpliera con las obligaciones accesorias asumidas por éste.
El 28 de agosto de 1998, el Sr. Mattei cursó nueva carta en la que indicó su interés de formalizar la compraventa, pero que no había podido cumplir con la condición de liberar los solares de gravámenes debido a que uno de los inquilinos en uno de los solares se rehusaba a abandonar el mismo y que por ello se encontraban enfrascados en un procedimiento judicial de accesión. Además, señaló que no le constaba el depósito del cheque de diez mil dólares ($10,000.00) indicados por Artic.
Así las cosas, continuaron las comunicaciones por escrito entre las partes; por un lado, el Sr. Mattei ofreció los solares tal y cual se encontraban, sin que se eliminaran las edificaciones en ellos y por otra Artic manifestó su disposición a esperar que culminara el proceso de accesión ante el tribunal de instancia para formalizar el negocio tal y cual se había pactado el 4 de febrero de 1998. La última comunicación por parte del Sr. Mattei, a través de su abogado el Lie. Celso Suárez Alicea, fue del 16 de diciembre de 1998. En dicha misiva, le informaba a Artic que era imposible cumplir con la condición de entregar los solares libre de edificaciones y gravámenes para el 31 de diciembre de 1998 y que, por tanto, el Sr. Mattei daba por cancelado el contrato, por no haberse evidenciado que en efecto se había realizado el pago inicial de diez mil dólares ($10,000.00).
En carta del 20 de enero de 1999, Artic le indicó al Sr. Mattei que ésta sí le había entregado el depósito de diez mil dólares ($10,000.00) al corredor de bienes y raíces, copia la cual incluia con su carta. Asimismo, negó la validez de la cancelación unilateral del contrato y que por ello consideraba vigente el negocio, por lo que aún estaba dispuesto a esperar que el Sr. Mattei desalojara a los inquilinos de los solares en controversia. Luego de esta carta, Artic no recibió ninguna otra comunicación de Mattei.
Según lo indicado en la demanda, intentos posteriores por comunicarse con el Sr. Mattei o su abogado, el *1105 Lie. Suárez, para obtener información en cuanto al cierre del negocio resultaron infructuosos. No es hasta el 4 de junio de 1999, según lo alegado por Artic, que ésta advino en conocimiento de que el Sr. Mattei había vendido los solares en cuestión a Tech Studios, aunque para ese entonces en el Registro de la Propiedad no constaba la inscripción de tal transacción de compraventa.
En la demanda de Artic se incluyó al Ledo. Suárez como codemandado debido a su alegada participación en la segunda contratación en detrimento de los derechos que alegadamente poseía el demandante y con conocimiento del contrato preexistente. Se le imputó al Sr. Mattei incumplimiento de su obligación contractual y responsabilidad torticera por los daños sufridos por Artic. Asimismo, le adjudicó conocimiento a Tech Studios de la obligación preexistente. Por todo lo cual, Artic solicitó al tribunal de instancia, en suma, que ordenara el cumplimiento específico de las obligaciones asumidas por virtud del contrato del 4 de febrero de 1998 y que ordenara la celebración de un contrato de compraventa entre Mattei y Artic, además de una suma por concepto de los daños y perjuicios causados. Tech Studios fue emplazada el 18 de junio de 1999. Los codemandados Suárez y Mattei fueron emplazados el 21 de junio y 1ro. de julio de 1999 respectivamente.
Es un hecho incontrovertido por las partes que Tech Studios y Mattei otorgaron escritura pública de contrato de compraventa el 6 de julio de 1999, en el que Mattei vendía los solares en controversia por la cantidad de doscientos mil dólares ($200,000.00). Dicha escritura fue presentada para inscripción el 12 de agosto de 1999.
Así las cosas, el 13 de octubre de 1999, Tech Studios contestó la demanda, negando de forma general las alegaciones. Por otro lado, en mociones del 5 y 27 de agosto de 1999, Artic solicitó que se le anotara la rebeldía al Sr. Mattei y al Ledo. Suárez a tenor a lo dispuesto por la Regla 45 de Procedimiento Civil, 32 L.P.R.A. Ap. Ill, R. 45, debido a que éstos no habían contestado la demanda. El 14 de septiembre de 1999, el tribunal de instancia emitió resolución anotando a ambas partes la rebeldía. A pesar de que ambas partes presentaron posteriormente varios escritos solicitando la desestimación de la solicitud de sentencia sumaria presentada por Artic y el relevo de la rebeldía, el tribunal se reiteró en su dictamen. La aludida moción de Artic solicitando se dictara sentencia sumaria a su favor fue presentada el 22 de mayo de 2000.
En lo pertinente, el 12 de septiembre de 2000, Tech Studios presentó moción en oposición a la sentencia sumaria. En esencia, argumentó, que la obligación adquirida por el Sr. Mattei con Artic se había vencido al transcurrir la fecha indicada para la celebración del contrato de compraventa, es decir, el 30 de abril de 1998. También, alegó que sus actuaciones fueron conforme a la información provista por el Sr. Mattei, el cual había manifestado que sobre la propiedad no existía ninguna obligación, además de que había ejercido la diligencia necesaria al realizar un estudio de los asientos del Registro de la Propiedad del cual no surgía la existencia de gravamen alguno sobre la propiedad. Argüyó, además, que el contrato suscrito entre Artic y el Sr. Mattei no tenía validez por constituir una enajenación de un bien inmueble, sin que en el negocio hubiera participado la esposa del Sr. Mattei. En cuanto al contrato de compraventa que suscribió con el Sr. Mattei, éste argüyó que llevaba más de un año realizando gestiones para financiar la compraventa. Entre otras cosas señaló que había suscrito con Sr. Mattei un contrato de compraventa el 23 de julio de 1998, el cual había vencido treinta (30) días posteriores a su firma, debido a los pleitos pendientes de accesión que concernían la propiedad impidieron que se otorgara escritura pública de compraventa en el término estipulado. Por esta razón se vio obligado a suscribir un segundo contrato de opción de compra; según lo aducido por dicha parte, fue firmado el 25 de marzo de 1999. En apoyo de su argumento sometió varios documentos entre los que incluia unas certificaciones del Banco Popular que confirmaban las gestiones que venía realizando Tech Studios desde el 18 de septiembre de 1998 para adquirir financiamiento para la compra de la propiedad.
En orden notificada el 6 de octubre de 2000, el foro de instancia señaló una vista para la discusión de la moción de sentencia sumaria; dicha vista fue pautada para el 26 de octubre de 2000.
*1106 En la fecha señalada se celebró la vista argumentativa. Según consta en la minuta de dicha vista, el tribunal de instancia reiteró la anotación de rebeldía a los codemandados Sr. Mattei y el Ledo. Suárez. También descalificó al Ledo. Suárez como representante legal del Sr. Mattei.
El 24 de julio de 2002, el tribunal de instancia notificó la sentencia parcial, apelada en el recurso de epígrafe. El tribunal concluyó que el contrato entre Artic y el Sr. Mattei fue un contrato de promesa bilateral de compraventa, que el contrato entre Mattei y Tech Studios era nulo ab initio por haber sido otorgado por ambas partes con conocimiento de la obligación preexistente, o sea, que había mediado una causa ilícita que invalidaba el negocio jurídico. Como consecuencia, ordenó al Registrador de la Propiedad la cancelación del asiento de inscripción sobre título de propiedad a favor de Tech Studios. Así también ordenó al Sr. Mattei el cumplimiento específico de las prestaciones contraídas por medio del contrato del 4 de febrero de 1998. Determinó que los codemandados habían actuado dolosamente y que debían solidariamente responder por los daños ocasionados a Artic, cuya cuantía sería determinada posteriormente.
Inconforme con esta determinación, el 23 de agosto de 2002, Tech Studios presentó el recurso de apelación de autos. En el mismo hizo los siguientes señalamientos:

“PRIMER ERROR: Cometió error el Tribunal Sentenciador al concluir que el contrato otorgado entre Artic-Kar [sic], Inc. y el codemandado Carlos Mattei el 4 de febrero de 1998, era el de promesa bilateral de compraventa (cuando en estricto derecho se trata de un contrato de opción de compra) y que en virtud de dicho contrato, la parte demandante había adquirido la propiedad.

SEGUNDO ERROR: Es errada la decisión del Tribunal de Primera Instancia de que el contrato suscrito entre Carlos Mattei y Artic-Kar, Inc. es válido y tiene plena eficacia, a pesar de que la señora Marina Seijo del Río, esposa del codemandado Mattei y titular registral del inmueble, no suscribió dicho contrato y nunca ratificó el mismo.

TERCER ERROR: Incidió el foro de instancia al no reconocer que el contrato otorgado el 23 de julio de 1998 entre Carlos Mattei y Tec Color Lab, Inc. es uno de compraventa.

CUARTO ERROR: Cometió error el Tribunal de Primera Instancia al decretar la nulidad de la escritura de compraventa otorgada entre Tec Color Lab, Inc. y el codemandado Carlos Mattei el 6 de julio de 1999, bajo el fundamento de que se trata de un contrato con causa ilícita y en daño de tercero.

QUINTO ERROR: Es errada la conclusión del Tribunal de Instancia de que Tec Color Lab, Inc. actuó dolosamente al interferir o impedir que se otorgase la escritura de compraventa entre Artic-Kar y Mattei y, que la parte apelante es responsable solidariamente de los alegados daños causados a la parte demandante.

SEXTO ERROR: Erró el foro de instancia al concluir que Tec Color Lab, Inc. no es un tercero registral de buena fe, así como al ordenar la cancelación del asiento de inscripción del título de dominio a favor de la parte apelante.

SEPTIMO ERROR: Es improcedente el remedio concedido por el foro de instancia del cumplimiento específico del contrato entre el codemandado Carlos Mattei y Artic-Kar, Inc.

OCTAVO ERROR: Es errado el dictamen del Tribunal de Primera Instancia de dictar sentencia sumaria a favor de Artic-Kar, Inc. ”

Luego de varios incidentes procesales, el 18 de septiembre de 2002, Artic presentó ante nos una moción solicitando la desestimación del recurso de epígrafe. En. esencia sostuvo que el recurso poseía deficiencias en la *1107 notificación a las partes de la presentación del recurso dentro del término jurisdiccional. Además, sostuvo que el recurso no se había perfeccionado por carecer de un apéndice completo y organizado. Mediante resolución notificada el 3 de octubre de 2002, concedimos a Artic término de treinta (30) días para que radicara su alegato. El 22 de noviembre de 2002, Tech Studios presentó escrito en oposición a la desestimación solicitada.
El 10 de febrero de 2003, Artic presentó su alegato. En suma, reiteró la postura asumida por el tribunal de instancia en cuanto a que el contrato de compraventa otorgado por Tech Studios y Mattei y su posterior inscripción en el Registro no transfirió título alguno sobre la propiedad, puesto que Tech Studios obró en contra de los principios de la buena fe y en daño de tercero. También insistió que el remedio concedido era el apropiado debido a que en derecho le correspondía el cumplimiento específico de la obligación, además de la remuneración correspondiente por los daños y perjuicios sufridos. Mediante resolución notificada el 19 de febrero de 2003, le ordenamos al tribunal de instancia que elevara los autos originales de este caso, lo cual dicho foro hizo el 10 de marzo de 2003.
Es norma bien reiterada en nuestra jurisprudencia que las cuestiones de jurisdicción, por ser privilegiadas, deben ser resueltas con preferencia y de carecer un tribunal de jurisdicción, lo único que puede hacer es así declararlo. Carattini v. Collazo Sist. Análisis, Inc., 158 D.P.R. _, 2003 J.T.S. 4; Arriaga Rivera v. Fondo del Seguro del Estado, 145 D.P.R. 122, 127 (1998); Autoridad sobre Hogares v. Sagastivelza, 71 D.P.R. 436, 439 (1950). Por ende, procedemos a atender los planteamientos jurisdiccionales planteados.
II
Múltiples han sido los esfuerzos de nuestro ordenamiento jurídico por liberalizar nuestras disposiciones procesales, a los fines de que los pleitos se vean en los méritos. Por ello, nuestro ordenamiento ha ido limitando las instancias en que los formalismos o tecnicismos legales tengan preeminencia sobre la dilucidación de las controversias planteadas en los litigios, con particular énfasis a que toda persona, irrespectivo de su nivel socio-económico, tenga fácil acceso a la justicia a través del ejercicio de su derecho estatutario a que un foro colegiado a nivel apelativo revise las determinaciones judiciales y administrativas que pueden afectar sus derechos. Véase, Andrés Román Velázquez v. Andrés Román Hernández, _ D.P.R. _, 2002 J.T.S. 132; Soc. de Gananciales v. García Robles, 142 D.P.R. 241, 259-260 (1997). En aras de alcanzar un sistema de justicia más accesible para todo ciudadano, el 22 de agosto de 2003 se aprobó la nueva “Ley de la Judicatura del Estado Libre Asociado de Puerto Rico de 2003”, Ley Núm. 201 del 22 de agosto de 2003, que derogó la Ley de la Judicatura de 1994.
Dicha Ley 201 entró en vigor, el jueves, 20 de noviembre de 2003, y en entre sus mandatos a este foro incluye: “[e]l Tribunal de Apelaciones deberá cumplir con el objetivo de esta Ley de dar mayor acceso a la ciudadanía a los procesos judiciales. Deberá ofrecer acceso fácil, económico y efectivo a sus procedimientos, eliminando obstáculos y barreras que impidan impartir justicia apelativa a los ciudadanos con reclamos válidos.” Artículo 4.002 de la Ley Núm. 201.
El Reglamento Transitorio de este Tribunal, aprobado por el Tribunal Supremo de Puerto Rico mediante Resolución de 18 de noviembre de 2003 (ER-2003-7), impone como requisito de todo recurso, la presentación de un apéndice que contenga copias literales de los documentos esenciales para sustentar el mismo. Respecto a los escritos de apelación en casos civiles, la Regla 16(E) de dicho Reglamento, en su parte pertinente, dispone que el apéndice incluirá una copia literal de: “(a) Las alegaciones de las partes, a saber: la demanda principal, las demandas de coparte o de tercero, y la reconvención, y sus respectivas contestaciones...”. Regla 16(E) (1) (a) del Reglamento Transitorio del Tribunal de Apelaciones.
También precisa en su inciso (d) que el apéndice deberá contener “toda resolución u orden, y toda moción o escrito de cualquiera de las partes que forme parte del expediente original en el Tribunal de Primera Instancia, en las cuales se discuta expresamente cualquier asunto planteado en el escrito de apelación, o que sean *1108 relevantes a éste.'” Regla 16(E) (1) (d) del Reglamento Transitorio. Por último, éste deberá incluir “cualquier otro documento que forme parte del expediente original en el Tribunal de Primera Instancia y que pueda serle útil al Tribunal de Apelaciones para resolver la controversia. ” Regla 16(E) (1) (e).
No obstante lo anterior, el Reglamento Transitorio incorpora como cambio sustancial a nuestro anterior Reglamento que el apéndice del recurso ya no será de carácter jurisdiccional. En lo pertinente, la norma reza:

“(3) El Tribunal de Apelaciones podrá permitir a la parte apelante la presentación de los documentos a que se refiere el inciso (1), con posterioridad a la fecha de la presentación del escrito de apelación, dentro de un término de quince (15) días contado el mismo a partir de la fecha de notificación de la resolución del Tribunal informándole los documentos omitidos.

La omisión de la presentación de documentos del Apéndice no será causa de desestimación del recurso. Regla 16(E) (3)

(4) (...)

(5) (...)

(6) El Tribunal dará oportunidad a las partes de corregir cualquier defecto deforma del recurso. ” (Enfasis nuestro.)
Por su parte, la Regla 89 del Reglamento Transitorio establece que las disposiciones allí contenidas aplicarán tanto a los recursos presentados a partir del 20 de noviembre de 2003, como a aquellos aún pendientes ante el Tribunal de Apelaciones.
En su alegato, Artic señala que el recurso de autos carece de una serie de documentos que, según lo aducido por éste, son indispensables para el ejercicio de nuestro deber ministerial; además señala que el apéndice incluido no sigue una secuencia numérica ascendente y muchos documentos no coinciden con el índice provisto. Conforme a lo antes expuesto, es innecesario que enumeremos los documentos los cuales el apelado alude, debido a que la ausencia de un apéndice completo no será motivo para la desestimación del recurso.
Aún así, si tomáramos en consideración lo estatuido en nuestro antiguo Reglamento aprobado bajo la Ley de la Judicatura de 1994, no procedería la desestiniación del recurso, debido a las recientes expresiones del Tribunal Supremo en Andrés Román Velázquez v. Andrés Román Hernández, supra, opinión Per Curiam en la que el Tribunal resolvió que: “[c]omo regla general, el mecanismo procesal de la desestimación como sanción debe utilizarse como último recurso. Por consiguiente, cuando el Tribunal [de Circuito de Apelaciones] utiliza dicho mecanismo procesal en casos de incumplimiento con su Reglamento, debe cerciorarse primero que el incumplimiento haya provocado un impedimento real y meritorio para que el Tribunal pueda atender el caso en los méritos. ” Luego de estudiado cuidadosamente el apéndice del recurso, constatamos que Tech Studios incluyó los documentos indispensables para este Tribunal realizar su función revisora.
Lo anterior, empero, no dispone en su totalidad de los planteamientos jurisdiccionales de Artic. Por cuanto la apelada indica que Tech Studios obvió notificar la apelación de epígrafe al Lie. Max Pérez Preston, quien fuera el representante legal de Tech Studios durante gran parte de los procedimientos ante el foro de instancia. En particular intimó que conforme a las Reglas 53.2 (d) y 67 de Procedimiento Civil, 32 L.P.R.A. Ap. III, y la Regla 13 (B) del entonces vigente Reglamento de este Tribunal, que corresponde de igual forma con la 13 (B) del Reglamento Transitorio ahora vigente, el recurso de apelación ha de ser notificado a todas las partes involucradas o a sus abogados de récord dentro del término dispuesto para incoar la apelación, lo cual incluia al Lie. Pérez, quien no forma parte de la etapa apelativa del caso.
*1109 Dicho planteamiento no nos merece mayor discusión que el que es evidente que el principio estatutario de la notificación persigue cumplir con el doctrina del debido proceso de ley, que exige que una parte esté adecuadamente informada de las acciones legales que podrían afectar sus derechos, de manera que pueda defenderlos de la forma que estime apropiada. Caro Ortiz v. Cardona Rivera, 158 D.P.R. _, 2003 J.T.S. 13, Op. del 11 de febrero de 2003; Asoc. Residentes v. Montebello Dev. Corp., 138 D.P.R. 412 (1995). No es un mero tecnicismo que exige de forma mecánica que el apelante notifique a cualquier persona que en algún momento estuvo involucrada de una forma u otra en el caso, mucho menos cuando se trata del abogado que le representó, debido a que esto implicaría que el tribunal debe desestimar un recurso porque el apelante no se notificó a sí mismo su apelación. El Lie. Pérez no tiene ningún interés envuelto en el caso y evidentemente Tech Studios está asistido de nueva representación legal para esta nueva etapa judicial. El planteamiento es completamente frívolo.
En razón de lo anterior, se declara no ha lugar la desestimación del recurso según solicitada por la parte apelada.
III
La sentencia recurrida fue emitida de forma sumaria bajo la Regla 36 de Procedimiento Civil, 32 L.P.R.A. Ap. III; por tanto, se impone un breve análisis de dicha norma y su aplicación a la situación de autos.
La Regla 36 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 36, establece el mecanismo de sentencia sumaria, mediante el cual un tribunal puede disponer de un caso sin celebrar vista en su fondo si el promovente demuestra que no hay controversia en cuanto a los hechos esenciales alegados en la demanda y que tan sólo resta disponer de las controversias de derecho existentes. Santiago Rivera v. Ríos Alonso, _ D.P.R. _ (2002), 2002 J.T.S. 21; Pardo v. Sucn. Stella, 145 D.P.R. 816 (1998); Soto v. Rivera, 144 D.P.R. 500 (1997); Guerrido García v. U.C.B., 143 D.P.R. 337 (1997); PFZ Props., Inc. v. Gen. Acc. Ins. Co., 136 D.P.R. 881 (1994); Medina v. M.S. & D. Química P.R., Inc., 135 D.P.R. 716 (1994); Tello v. Eastern Airlines, 119 D.P.R. 83 (1997). Ahora bien, aunque promueve la economía procesal, el objetivo de la sentencia sumaria, como el de toda acción judicial, es proveer una solución justa a la controversia entre las partes. Fernández & Gutiérrez, Inc. v. Mun. San Juan, 147 D.P.R. 824 (1999); López v. J. Gus Lallande, 144 D.P.R. 774 (1998); Hurtado v. Osuna, 138 D.P.R. 801 (1995); Pilot Life Ins. Co. v. Crespo Martínez, 136 D.P.R. 624, 632 (1994); Rivera et al. v. Superior Pkg., Inc. et al., 132 D.P.R. 115 (1992); Cuadrado Lugo v. Santiago Rodríguez, 126 D.P.R. 272, 279 (1990). Es por ello que, antes de disponer de un caso sumariamente, el tribunal debe determinar que no existe controversia en cuanto a los hechos y, en segundo lugar, que en derecho procede emitir sentencia a favor de la parte que la solicita. Piñero v. A.A.A., 146 D.P.R. 890 (1998); Audiovisual Lang. v. Sist. Est. Natal Hnos., 144 D.P.R. 563 (1997); Caquías v. Asoc. Res. Mansiones Río Piedras, 134 D.P.R. 181, 216 (1993); M.J.C.A., Menor v. J.L.E.M. Menor, 124 D.P.R. 910, 930 (1989).
En vista de que la sentencia sumaria adjudica el litigio sin que las partes tengan la oportunidad de presentar su caso en corte, la jurisprudencia la concibe como un “'remedio extraordinario que sólo debe concederse cuando el promovente ha establecido su derecho con claridad y ha demostrado que la otra parte no tiene derecho a recobrar bajo cualquier circunstancia que resulte discernible de las alegaciones que no hayan sido refutadas por la evidencia presentada con la moción”. Corp. of Presiding Bishop v. Purcell, 117 D.P.R. 714, 720 (1987); Santiago Rivera v. Ríos Alonso, supra. Por ello, la duda por parte del tribunal sobre la existencia de una controversia de hechos en el caso bajo su consideración derrota la moción de sentencia sumaria. Más aún, toda duda en cuanto a si un hecho fue controvertido debe resolverse a favor de la parte que se opone a la moción, puesto que, según nuestro ordenamiento jurídico, una parte tiene derecho a un juicio plenario cuando exista la más leve o mínima duda en cuanto a cuáles son los hechos.
Por lo anterior, la Regla 36.3 de las de Procedimiento Civil, supra, impone al juez que considera una moción de sentencia sumaria la obligación de considerar, no sólo las declaraciones juradas sometidas para *1110 sustentar o rebatir las alegaciones del promovente, sino todo documento admisible en evidencia que obre en autos. Flores v. Municipio de Caguas, 114 D.P.R. 521 (1983); Padín v. Rossi, 100 D.P.R. 259 (1971). A tenor con esta obligación, el juzgador deberá analizar concienzudamente la moción de sentencia sumaria y su oposición, sus anejos y el expediente en su totalidad, con el propósito de determinar si queda algún hecho material en controversia o si existen alegaciones afirmativas en la demanda radicada que no han sido refutadas; en cualquiera de dichos casos, de ello ser así, el tribunal deberá denegar la solicitud de sentencia sumaria. Cuadrado v. Santiago Rodríguez, 126 D.P.R. 272 (1990); Corp. of Presiding Bishop CJC of LDS v. Purcell, 117 D.P.R. 714 (1987). Una vez el tribunal tiene ante sí todos los documentos, debe analizar los hechos en la forma más favorable a la parte que se opone a que se dicte sentencia sumaria. Méndez Arocho v. El Vocero de P.R., 130 D.P.R. 867 (1992). La existencia de duda por parte del tribunal sobre la existencia o no de una controversia de hechos en el caso bajo su consideración, derrota la moción de sentencia sumaria. Corp. Presiding Bishop CJC of LDS v. Purcell, supra.
Asimismo, es norma reiterada que hay litigios y controversias que por su naturaleza no deben resolverse mediante una sentencia dictada sumariamente, “porque difícilmente en tales casos, el Tribunal puede reunir ante sí toda la verdad de los hechos a través de ‘affidavits ’ o deposiciones”. Elías y otros v. Chenet y otros, 147 D.P.R. 507 (1999); Audiovisual Lang. v. Sist. Est. Natal Unos., supra; Soto v. Hotel Caribe Hilton, 137 D.P.R. 294 (1994); García López v. Méndez García, 88 D.P.R. 363, 379 (1963). Entre estas controversias, el Tribunal Supremo ha señalado “aquéllas que contienen elementos subjetivos, o sea, aquéllas en las que el factor credibilidad juega un papel esencial, si no el decisivo, para llegar a la verdad, y donde un litigante depende en gran parte de lo que extraiga del contrario en el curso de un juicio vivo ”. Audiovisual Lang. v. Sist. Est. Natal Hnos., supra. De igual modo, el Tribunal Supremo ha advertido que “[e]l tribunal sólo debe dictar sentencia sumaria cuando lo estime necesario” y “[e]n el sano ejercicio de esta discreción, no debe resolver sumariamente casos complejos o casos que envuelvan cuestiones de interés público ”. Corp. Presiding Bishop CJC of LDS v. Purcell, supra, a la pág. 723.
A tenor con lo anterior, para poder disponer de un caso mediante sentencia sumaria el tribunal debe determinar que no existen controversias en cuanto a los hechos y determinar que en derecho procede emitir sentencia sumaria a favor o en contra de cualquier parte en el pleito. Pinero v. A.A.A., supra; Guerrido García v. U.C.B., 143 D.P.R. 337 (1997); J.A.D.M. v. Centro Comercial Plaza Carolina, 132 D.P.R. 785 (1993); Consejo Tit. C. Parkside v. MGIC Financial Corp., 128 D.P.R. 538 (1991).
IV
En numerosas ocasiones nuestra jurisprudencia ha señalado que la buena fe es una exigencia elemental de nuestro derecho y como tal está presente en todo nuestro ordenamiento jurídico. Velilla v. Pueblo Supermarkets, 111 D.P.R. 585, 588 (1981); Ramírez v. Club Cala de Palmas, 123 D.P.R. 339, 346 (1989). En este espíritu, es doctrina fundamental de la contratación, reiterada en numerosas ocasiones por el Tribunal Supremo de Puerto Rico, que a partir del momento en que se perfecciona el contrato [los cuales se perfeccionan por el mero consentimiento de los contratantes], las partes quedan obligadas al cumplimiento de lo expresamente pactado y a las consecuencias naturales que se deriven del mismo, ello conforme a la buena fe, al uso y a la ley. Artículo 1210 Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3375; Irizarry López v. García Cámara, _ D.P.R. _ (2001), Op. del 27 de noviembre de 2001, 2001 J.T.S. 164, a la pág. 456; Trinidad García v. Chade, _ D.P.R. _ (2001), Op. del 18 de enero de 2001, 2001 J.T.S. 10, a la pág. 792; Ramírez v. Club Cala de Palmas, supra, a la pág. 345. La buena fe ha sido descrito como un elemento de carácter subjetivo que impone a las partes una conducta de lealtad y fidelidad a lo pactado entre éstas. Banco de Santander v. Rosario Cirino, 126 D.P.R. 591, 605 (1990); Ramírez v. Club Cala de Palmas, supra; Prods. Tommy Muñiz v. COPAN, 113 D.P.R. 517, 528 (1982);
La teoría general sobre las obligaciones contractuales, en lo pertinente, establece que no hay contrato hasta que concurran los siguientes requisitos: “(1) consentimiento de los contratantes, (2) objeto cierto que sea *1111 materia del contrato, (3) causa de la obligación que se establezca”. Art. 1213 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3391. Por otra parte, en materia especial de los contratos, nuestro Código Civil ha reglamentado la existencia de los contratos de compra y venta y el llamado contrato de promesa bilateral de compra y venta.
El primero de éstos ha sido definido como un pacto en el que “uno de los contratantes se obliga a entregar una cosa determinada y el otro a pagar por ella un precio cierto”. Art. 1334 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3741. El Art. 1339 del Código Civil, 31 L.P.R.A. sec. 3746, establece que la venta se perfecciona y será obligatoria para ambas partes si éstas convienen en la cosa objeto del contrato y en el precio, aunque ninguna de éstas haya sido entregadas.
Asimismo, es norma ampliamente conocida en nuestra jurisdicción que el contrato de compra y venta por sí sólo no transfiere el dominio del objeto vendido, esto es, no basta con el acuerdo de voluntades o perfeccionamiento del contrato, sino que es indispensable que se produzca la tradición o entrega de la cosa, lo cual constituye un acto físico que evidencia la intención de transmitir la posesión o la entrega del objeto. VELCO v. Industrial Serv. Apparel, 143 D.P.R. 243, 250 (1997); Maeso v. The Chase Manhattan Bank, 133 D.P.R. 196, 201-202 (1993).
Por su parte, la promesa de vender o comprar está dispuesto en el Art. 1340 del Código Civil de P.R., 31 L. P.R.A. sec. 3747: “La promesa de vender y comprar, habiendo conformidad en la cosa y el precio, dará derecho a los contratantes para reclamar recíprocamente el cumplimiento del contrato”. El Código además dispone que siempre que no pueda cumplirse la promesa de compra y venta, regirá entre las partes lo dispuesto acerca de las obligaciones y contratos en el propio Código. Id.
El contrato de promesa bilateral de compraventa, reglamentado por la disposición antes citada del Código Civil, ha sido objeto de extenso análisis por nuestro más alto foro, debido particularmente a la confusión acaecida entre esta figura contractual y el contrato de opción de compra y venta, que no está regulado por el Código Civil. Nuestra jurisprudencia ha indicado que la promesa de comprar y vender ha sido conceptualizado por la tradición civilista española como un contrato preparatorio o pre-contrato, cuyos resultados no pueden coincidir con los de una compra y venta consumada. Soto v. Rivera, supra, a la pág. 509; Jordán-Rojas v. Padró-González, 103 D.P.R. 813, 817 (1975). Por ello, el Tribunal ha sido enfático en que el incumplimiento de una promesa de comprar y vender no confiere un derecho real, sino que crea una obligación personal que no otorga título de dominio sobre la propiedad al carecer de finalidad traslativa del dominio. Soto v. Rivera, supra; Jordán-Rojas v. Padró-González, supra.
En suma, la jurisprudencia ha indicado que la promesa bilateral de compraventa impone a ambas partes una obligación de hacer y no de dar; la misma consiste en la realización futura de un contrato de compraventa definitivo. Soto v. Rivera, supra, a las págs. 509-510; Jordán-Rojas v. Padró-González, supra, a la pág. 818; Rosa Valentín v. Vázquez Lozada, 103 D.P.R. 796, 811 (1975). Esto ha sido justificado como una necesidad jurídica, dada la ventaja práctica de conseguir la vinculación de los contratantes de forma inmediata, cuando por alguna razón no puede realizarse la compraventa definitiva. Jordán-Rojas v. Padró-González, supra, a la pág. 818.
No obstante lo anterior, en Jordán-Rojas v. Padró-González, supra, el Tribunal Supremo hizo hincapié en que, a pesar de que el incumplimiento con una promesa bilateral de compra y venta impone una obligación personal, procede una acción judicial para exigir el cumplimiento específico de la obligación y no meramente una acción en daños, si el objeto de la prestación aún permanece en el patrimonio del vendedor. Jordán-Rojas v. Padró-González, supra, pág. 819, citando a Roca Sastre, Estudios de Derecho Privado, Vol. I, págs. 323-362. En particular señaló:
*1112 “En principio, siempre que no exista una imposibilidad de hecho, puede exigirse el cumplimiento, ‘in natura ’ de la obligación de otorgar un nuevo contrato de compraventa. Así pues, si la cosa prometida en venta está todavía en el patrimonio del promitente, el acreedor en un contrato de promesa bilateral de venta de un inmueble podría exigir su cumplimiento en forma específica: la celebración de la venta previamente convenida y el otorgamiento de la correspondiente escritura pública...”. (Enfasis en el original.) Jordán-Rojas v. Padró-González, supra, pág. 819.
En casos en que el objeto de contratación ha sido vendido a diferentes compradores, el Código Civil ha señalado que:

“Si una misma cosa se hubiere vendido a diferentes compradores, la propiedad se transferirá a la persona que primero haya tomado posesión de ella con buena fe si fuere mueble.

Si fuere inmueble, la propiedad pertenecerá al adquirente que antes la haya inscrito en el registro.

Cuando no haya inscripción, pertenecerá la propiedad a quien de buena fe sea primero en la posesión; y faltando ésta, a quien presente título de fecha más antigua, siempre que haya buena fe.” Art. 1362 del Código Civil, 31 L.P.R.A. sec. 3822.
Lo anterior debe verse en conjunto con el Art. 105 de la Ley Hipotecaria de 1979, 30 L.P.R.A. sec. 2357, la cual dispone lo concerniente a las garantías adquiridas por la figura del tercero registral. El Tribunal Supremo ha observado sobre este articulado que todo aquel que reclama la protección del Registro para excluir los derechos que pueda poseer otra parte, debe probar la concurrencia de varios requisitos, los cuales son: (1) la parte que solicita la protección es un tercero civil, (2) que de buena fe, (3) y a título oneroso, (4) en un negocio intervivo válido, (5) adquiere un derecho real inmobiliario inscrito, (6) de persona que en el Registro de Propiedad aparezca con facultades para transmitirle, en función de un registro inexacto, sin que consten clara y expresamente las causas de la inexactitud ni concurra alguna de las excepciones a la aplicación de la fe pública registral y que, (7) a su vez, haya inscrito su adquisición. Art. 105 de la Ley Hipotecaria de 1979, supra; Banco de Santander v. Rosario Cirino, 126 D.P.R. 591, 603-604 (1990). En lo pertinente y en cuanto a quién constituye el tercero civil, en Banco de Santander v. Rosario Cirino, supra, nuestro más alto foro señaló que dicho tercero tenía que ser una persona ajena al negocio jurídico o contrato que esté en controversia, de modo que el tercero es aquella persona que, ajena al contrato, ejercita derechos adquiridos de buena fe que están en conflicto con quienes intervinieron en el contrato. Banco de Santander v. Rosario Cirino, supra, pág. 604. Además, se enfatizó que el principio de prioridad registral no ha de desvincularse de los principios generales de la buena fe. La buena fe exigida al tercero registral es el desconocimiento de la inexactitud registral, es decir, de la venta previa. La buena fe hipotecaria exige un mínimo de diligencia y ésta le es exigida al tercer adquirente en el momento exacto en que celebró el negocio jurídico de adquisición que dio lugar a la inscripción. Banco de Santander v. Rosario Cirino, supra, pág. 604; Jordán-Rojas v. Padró-González, supra, pág. 820.
En Jordán-Rojas v. Padró-González, supra, el Tribunal Supremo aplicó este análisis para invalidar una compraventa inscrita con posterioridad a que los terceros advinieran en conocimiento de la existencia de una promesa bilateral de compraventa preexistente. El Tribunal razonó que, a pesar de que la promesa bilateral de compraventa constituye una obligación personal, la misma va dirigida en última instancia a obtener una modificación jurídica de carácter real. De manera que de no haberse realizado el segundo negocio jurídico, los contratantes que suscribieron la promesa bilateral tendrían derecho a solicitar el otorgamiento de la correspondiente escritura de compraventa. Jordán-Rojas v. Padró-González, supra, pág. 821.
Los hechos particulares de este caso nos exigen que elaboremos brevemente sobre la naturaleza de los contratos denominados como de opción de compraventa. Como ya indicáramos anteriormente, el contrato de opción no está regulado por el Código Civil, empero, tomando en cuenta que las partes están libres de pactar *1113 todas aquellas condiciones y cosas que no sean contrarias a la ley, la moral y el orden público (Artículo 1207 del Código Civil de Puerto Rico, 31 L.P.R.A. Sec. 3372), la jurisprudencia ha reconocido la existencia de este contrato al que le es aplicable toda la teoría general sobre obligaciones y contratos. El contrato de opción de compra fue definido por el Tribunal Supremo de Puerto Rico como “un contrato consensual, mediante el cual una parte (promitente u optatario) le concede a otra parte (optante), el derecho exclusivo a decidir de manera unilateral si comprará determinado bien inmueble que le pertenece al promitente”. “Esta facultad tendrá que ejercitarse dentro de un período de tiempo definido por las partes, y tanto el promitente como el optante se beneficiarán con el negocio. ” Irizarry López, et al. v. García Cámara, et al., _ D.P.R._ (2001), Op. del 27 de noviembre de 2001, 2001 J.T.S. 164, a la pág. 455; Rosa Valentín v. Vázquez Lozada, supra, págs. 806-807; Atocha Thom McAn, Inc. v. Registrador, 123 D.P.R. 571, 583 (1989).
La jurisprudencia ha adoptado la tesis que propone que el contrato de opción es un pre-contrato o contrato preparatorio a la compraventa y que el mismo es una obligación unilateral, puesto que el optante “no está obligado a nada”, es decir, que compra si lo desea; es el promitente el que viene obligado a reservar la propiedad por el tiempo fijado y así sacarlo del mercado, así también vendrá obligado a vender la propiedad si el optante así lo solicita. Irizarry López, et al. v. García Cámara, et al., supra; Rosa Valentín v. Vázquez Lozada, supra; Atocha Thom McAn, Inc. v. Registrador, supra. De manera que el Tribunal ha resumido de la siguiente manera los elementos esenciales de dicho contrato: “(1) se concede al optante la facultad de decidir unilateralmente si celebrará el contrato principal (la compra y venta) sin ninguna obligación por parte de éste; (2) dicha concesión tiene carácter de exclusividad; (3) se establece un plazo para ejercitar la opción; y (4) no existe otra condición que no sea la voluntad del optante”. Irizarry López, et al. v. García Cámara, et al., supra, a la pág. 455. La aceptación por parte del optante de la opción de compra no implica el perfeccionamiento automático de un contrato de compraventa, sino la obligación por parte del promitente de vender y del optante de comprar. Ello ha sido interpretado por el Tribunal como indicativo de que la aceptación de la opción impone una obligación de hacer, en este caso de formalizar un contrato de compraventa. Rosa Valentín v. Vázquez Lozada, supra, págs. 810-811.
No empece a las múltiples similitudes entre el contrato de opción de compra y la promesa bilateral de compraventa, la jurisprudencia ha distinguido un negocio del otro. En particular se ha resaltado que la opción es un negocio unilateral, puesto que solamente el optatario o promitente es el obligado, mientras que la promesa de compra y venta es una obligación bilateral en la que se obligan dos: el que promete vender y que el que promete comprar. Rosa Valentín v. Vázquez Lozada, supra.
El incumplimiento de los contratos, ya sea uno de compraventa, de opción ejercida o promesa de compraventa no consumada, independientemente de que proceda o no el cumplimiento específico de la obligación, impone la obligación de resarcimiento de daños por parte del vendedor a tenor con los Artículos 1054 y 1077 del Código Civil de Puerto Rico, 31 L.P.R.A. secs. 3018 y 3052, respectivamente. Tales artículos disponen que:

“Quedan sujetos a la indemnización de los daños y perjuicios causados, los que en el cumplimiento de sus obligaciones incurrieren en dolo, negligencia o morosidad, y los que de cualquier modo contravinieren al tenor de aquéllas. Art. 3018 del Código Civil, supra.”

La facultad de resolver las obligaciones se entiende implícita en las recíprocas, para el caso en que uno de los obligados no cumpliere lo que le incumbe. El perjudicado podrá escoger entre exigir el cumplimiento o la resolución de la obligación, con el resarcimiento de daños y abono de intereses en ambos casos. También podrá pedir la resolución, aun después de haber optado por el cumplimiento, cuando éste resultare imposible... Art. 1077 del Código Civil, supra.
Los estatutos que preceden atienden lo concerniente a los daños incurridos entre las partes contratantes; sin *1114 embargo, nuestro ordenamiento jurídico ha reconocido la existencia de contratos en daños a tercero que tiene su génesis en la responsabilidad extracontractual incurrida por culpa o negligencia, regulada por el Artículo 1802 del Código Civil, 31 L.P.R.A. 5141. Gen. Office Prods. v. A.M. Capen's Sons, 115 D.P.R. 553, 558 (1984). La aludida figura impone responsabilidad a quien interfiere con un contrato causando daño a una de las partes. Dicha responsabilidad es solidaria con la responsabilidad del contratante que incumple con su obligación a sabiendas de su incumplimiento. Gen. Office Prods. v. A.M. Capen 's Sons, supra; Dennis, Metro Invs. v. City Fed. Savs., 121 D.P.R. 197 (1988).
De este modo, nuestro ordenamiento jurídico ha concluido que los elementos constitutivos de dicha causa de acción serán:

“En primer término, debe existir un contrato con el cual interfiera un tercero. Si lo que afecta es una expectativa o una relación económica provechosa sin que medie contrato, la acción no procede, aunque es posible que se incurra en responsabilidad bajo otros supuestos jurídicos.

En segundo lugar, debe mediar culpa. Adoptamos la posición mayoritaria de que basta a tal efecto con que el perjudicado pruebe o presente hechos que permitan inferir que el tercero actuó intencionalmente, con conocimiento de la existencia del contrato.

El tercer elemento es que se ocasione un daño al actor, y el cuarto, que ese daño sea consecuencia de la actuación culposa del tercero. El nexo causal es entre el acto del tercero y su efecto sobre el perjudicado. Es impertinente a estos efectos que el cocontratante del perjudicado haya tenido la intención de incumplir el contrato. Basta con que el tercero haya provocado o contribuido a la inejecución. En caso de concurrencia de culpas, la responsabilidad es solidaria.” (Enfasis suplido.) Gen. Office Prods. v. A.M. Capen's Sons, supra, págs. 558-559.
En el caso de Dennis, Metro Invs. v. City Fed. Savs., supra, el Tribunal Supremo abundó en cuanto a las consecuencias dimanantes del contrato en daño a tercero. En particular determinó que “en todos aquellos casos en que ambos contratantes se conciertan para ocasionar un daño al tercero, el contrato tiene causa ilícita y que, por consiguiente, esta circunstancia acarrea la nulidad del mismo”. “La nulidad puede ser solicitada por el tercero perjudicado, quien de esta manera puede poner fin a la lesión que mediante el contrato se le produce.” Dennis, Metro Invs. v. City Fed. Savs., supra, págs. 216-217, citando a Diez-Picazo, Fundamentos del Derecho Civil Patrimonial, Madrid, Ed. Tecnos, 1979, Vol. 1, pág. 281.
En materia de interpretación de contratos, es doctrina fundamental “que cuando los términos de un contrato son claros, y no dejan lugar a dudas sobre la intención de los contratantes, no cabe recurrir a reglas de interpretación”. Art. Artículo 1233 del Código Civil de P.R., 31 L.P.R.A. Sec. 3471; Trinidad García v. Chade, _ D.P.R. _, Op. del 18 de enero de 2001, 2001 J.T.S. 10, a la pág. 792.
Como puede verse, nuestro ordenamiento favorece el lenguaje claro en los contratos para asegurar el cumplimiento y mejor entendimiento de la voluntad de los contratantes. Solamente si el lenguaje resulta ambiguo o dudoso en cuanto a su significado, es que el juzgador puede examinar elementos extemos al contrato, tales como los actos de las partes coetáneos y posteriores al contrato. Véase el Artículo 1234 del Código Civil, 31 L.P.R.A. sec. 3472. Además, a tenor con el Artículo 1137 del Código Civil, 31 L.P.R.A. sec. 3474, “fijas cláusulas de los contratos deberán interpretarse las unas por las otras, atribuyendo a las dudosas el sentido que resulte del conjunto de ellas. ”
Finalmente, resulta necesario discutir las normas relacionadas con las facultades de los cónyuges que componen una sociedad legal de bienes gananciales para disponer de los bienes pertenecientes a la sociedad. En su Art. 93 el Código Civil, 31 L.P.R.A. sec. 286, dispone que, salvo lo dispuesto en la see. 284, cualquiera de *1115 los cónyuges podrá representar legalmente a la sociedad de bienes gananciales. Así también manifiesta que cualquier acto de administración unilateral de uno de éstos obligará a la sociedad y se presumirá válido a todos los efectos. Art. 93 del Código Civil de P.R., supra. En particular, el Art. 1313 del Código Civil, 31 L.P.R.A. sec. 3672 dispone:

“No obstante lo dispuesto en la see. 284 de este título, ninguno de los dos [cónyuges] podrá donar, enajenar, ni obligar a título oneroso, los bienes muebles e inmuebles de la sociedad de gananciales, sin el consentimiento escrito del otro cónyuge, excepto las cosas destinadas al uso de la familia o personales de acuerdo a la posición social o económica de ambos cónyuges.

Todo acto de disposición o administración que sobre dichos bienes haga cualquiera de los cónyuges en contravención a esta sección, y los demás dispuestos de en este título, no perjudicará al otro cónyuge ni a sus herederos.

El cónyuge que se dedicare al comercio, industria, o profesión, podrá adquirir o disponer de los bienes muebles dedicados a esos fines, por justa causa, sin el consentimiento del otro cónyuge. No obstante, será responsable por los daños y perjuicios que pudiere ocasionar por dichos actos a la sociedad legal de gananciales... ”.

Por su parte, el Art. 91 del Código Civil de Puerto Rico, 31 L.P.R.A. Sección 284, dispone:

“Ambos cónyuges serán los administradores de los bienes de la sociedad conyugal, salvo estipulación en contrario, en cuyo caso, uno de los cónyuges otorgará mandato para que el otro actúe como administrador de la sociedad.

[...]Los bienes inmuebles de la sociedad conyugal no podrán ser enajenados o gravados, bajo pena de nulidad, sino mediante el consentimiento escrito de ambos cónyuges... ”.

De manera que en los actos de disposición de los bienes inmuebles pertenecientes a la sociedad legal de gananciales es requisito indispensable el consentimiento por escrito de ambos, salvo las excepciones enumeradas en el Art. 1313 del Código Civil. Dichos actos de disposición constituyen tanto la compra como la venta de los bienes. Pérez Mercado v. Martínez Rondón, 130 D.P.R. 134, 149 (1992). Ello tiene el propósito de velar por los mejores intereses de la sociedad de gananciales ante los actos unilaterales de uno de los cónyuges, a la vez que se incorpora a la mujer en la co-administración de los bienes y, por tanto, equipararla respecto al hombre. Asimismo, tiene como tercer propósito, el proteger a terceros frente a la sociedad. Soto v. Rivera, supra; Pérez Mercado v. Martínez Rondón, supra.
Cualquier acto de uno de los cónyuges que exceda las atribuciones descritas en los estatutos previamente citados constituye una actuación ultra vires y por tanto no surtirán efectos jurídicos hasta que sea ratificado por el otro cónyuge. Mientras no se ratifique el contrato, el negocio es ineficaz por no haber mediado consentimiento. Soto v. Rivera, supra, págs. 514-515. A pesar de que la ausencia de consentimiento hace del negocio uno nulo en pleno derecho, el Tribunal Supremo ha optado por identificar dicha actuación por parte de los cónyuges como una ultra vires para enfatizar la posibilidad de ratificación, sin necesidad de que se celebre un nuevo contrato. Soto v. Rivera, supra, pág. 514. Del mismo modo, el Tribunal ha manifestado que sólo el cónyuge afectado por la exclusión del negocio contenido en un contrato en el que no consta su firma, está legitimada para impugnar el mismo. Pérez Mercado v. Martínez Rondón, supra, pág. 150.
V
En el caso de autos, Tech Studios hace ocho señalamientos de error. La primera controversia por dirimir concierne la naturaleza del contrato suscrito entre Artic y el Sr. Mattei.
*1116 En numerosas ocasiones nuestro más alto foro ha expresado que los negocios jurídicos han de ser calificados por las obligaciones contraídas por las partes y no por el título a ellos otorgados por éstas. Véase Irizarry López v. García Cámara, supra; Atocha Thom McAn, Inc. v. Registrador, supra. En el presente caso, el contrato suscrito entre Artic y Mattei el 4 de febrero de 1998, lleva por título “Option to Purchase Contrae!’ o contrato de opción. La primera cláusula de dicho contrato lee como sigue: “The undersigned sellers agree to sell, and the undersigned buyers agree to buy the property described as follows...”. Como puede observarse, las partes contratantes pactaron la compra y venta de la propiedad. De las prestaciones acordadas surge que Mattei se comprometía a vender la propiedad libre de edificaciones y gravámenes, mientras que Artic realizaría un pago total por la suma de doscientos dieciocho mil dólares (218,000.00), sujeto a, entre otras cosas, que los solares estuvieran zonificados como comerciales y verificación de la cabida de las mismas. Acordaron ambas partes, además, que la escritura pública de compraventa se otorgaría en o antes del 30 de abril de 1998, sujeto al financiamiento y a otros retrasos “razonablessin embargo, ambas partes debían cooperar para lograr el perfeccionamiento del negocio pactado. Finalmente, Artic debía hacer un pago inicial de diez mil dólares ($10,000.00), el cual se sumaría al total a pagarse por la propiedad.
De las prestaciones antes indicadas, concurrimos con el foro de instancia en que el contrato suscrito entre Mattei y Artic constituye una promesa bilateral de compraventa. Como puede observarse, las partes contrajeron una obligación bilateral, puesto que se debían prestaciones mutuamente.. Contrario al contrato de opción, no se dejó al exclusivo arbitrio de Artic el aceptar en un plazo predeterminado una oferta de venta, sino que ya se había comprometido a comprar y Mattei a vender, dejando para una fecha futura la consumación de un contrato de compraventa. Dicho contrato contiene el objeto del negocio, los dos (2) solares indicados; el consentimiento de ambas partes de perfeccionar una compra y venta sujeto a unas condiciones allí-contenidas, entre ellas, el entregar el solar limpio y libre de gravámenes; y finalmente, la causa del contrato, la suma total de doscientos dieciocho mil dólares (218,000.00). Claramente no constituye una compraventa perfeccionada, ya que no contiene las condiciones por las cuales se produciría la entrega, o tradición del dominio, indispensable para la consumación de la compraventa.
Por ende, por medio del contrato del 4 de febrero de 1998, Artic y Mattei habían asumido la obligación de realizar los actos que fueran necesarios para perfeccionar un contrato de compra y venta. No se cometió el primer error aducido.
Lo anterior nos lleva al segundo señalamiento de error, en cuanto a la validez o eficacia del contrato de Artic y Mattei, dado el hecho de que la esposa de este último no había consentido por escrito a dicho negocio. A pesar de que nuestro ordenamiento ha sido enfático en que sólo la parte afectada, en este caso la cónyuge del Sr. Mattei, tiene legitimidad para impugnar la validez de dicho contrato, resolvemos analizar el mismo para cercioramos de la eficacia de éste. La Asamblea Legislativa fue clara al disponer que ambos cónyuges pueden representar a la sociedad de bienes gananciales y que los actos administrativos de uno de éstos obligara a la sociedad y se presumen válidos, salvo las excepciones enumeradas en el Código. Entre estas excepciones destaca la imposición de gravámenes y la disposición; es decir, la compra y venta de los bienes de la sociedad conyugal. En el caso de autos nos hallamos ante un negocio jurídico que constituye un preacuerdo o pre-contrato en el que aún no se han pactado la transferencia del dominio; por ende, no se han dado las condiciones para la enajenación del bien. Esto implica que la promesa bilateral de compraventa es un acto administrativo donde la comparecencia de uno de los cónyuges es suficiente para obligar a la sociedad; sin embargo, el perfeccionamiento de un contrato de compraventa depende del consentimiento por escrito de ambas partes. No se cometió el error señalado.
En cuanto a los errores del recurso de epígrafe tercero, cuarto, quinto, sexto y séptimo, procedemos a atenderlos en conjunto por estar íntimamente relacionados. En esencia, Tech Studios señala que el foro de instancia incidió al no reconocer la validez del contrato “de compraventa” suscrito entre Tech Studios y Mattei el 23 de julio de 1998, al decretar la nulidad de la escritura de compraventa otorgada el 6 de julio de 1999, y al *1117 no reconocer su alegado carácter de tercero registral. Así también, cuestiona el que se le impusiese responsabilidad solidaria con Mattei por los daños alegados por Artic y por concluir el tribunal que procedía el cumplimiento específico del contrato entre Artic y Mattei.
Como concluyéramos anteriormente, Artic y el Sr. Mattei celebraron un preacuerdo de promesa de compra y venta en el que las partes se comprometían a formalizar un contrato de compraventa en o antes del 30 de abril de 1998. No obstante, los términos del contrato son claros en que las partes reconocían que otras circunstancias, fuera de la voluntad de los contratantes, podían retrasar la fecha pautada para otorgar la escritura. Comunicaciones posteriores entre Artic y Mattei evidencian que una de tales circunstancias se había producido. De los documentos que obran en autos, surge que entrado el mes de diciembre de 1998, era la intención tanto de Mattei como de Artic, según expresaba cada parte, el formalizar un contrato de compraventa, siendo la única condición pendiente de resolución el desahucio de los inquilinos que ocupaban los solares que Artic proponía adquirir. Hasta entrado el mes de diciembre de 1998, Artic había procedido confiado en el hecho de que se formalizaría la compraventa de los solares en cuestión, una vez Mattei lograra liberar los mismos de los inquilinos que las ocupaban, conforme a lo pactado.
No obstante, el 23 de julio de 1998, el Sr. Mattei había suscrito contrato de compraventa con Tech Studios donde le vendía los solares en controversia por la cantidad total de doscientos mil dólares ($200,000.00). Una lectura del contrato, en particular de la octava cláusula, demuestra que dicho contrato tendría “vigencia de treinta (30) días a partir de la firma del mismo”.
Ahora bien, nos corresponde evaluar el efecto, si alguno, del contrato de compraventa otorgado por Tech Studios y el Sr. Mattei el 6 de julio de 1999. Como expresáramos anteriormente, el incumplimiento de la promesa bilateral de compraventa impone una obligación personal, consistente en el resarcimiento de los daños y perjuicios causados. Sin embargo, nuestra jurisprudencia ha adoptado la tesis civilista española que concluye que, de encontrarse en el patrimonio del promitente la propiedad objeto de la promesa de compraventa, procede el cumplimiento específico de la obligación; es decir, si en el momento que el optante exige que se celebre el contrato de compraventa pautado le es posible al promitente otorgar el mismo, vendrá este último obligado a celebrar el contrato de compraventa además del resarcimiento de daños.
En el caso de autos, Artic presentó su demanda el 18 de junio de 1999 al advenir en conocimiento de que Mattei había vendido la propiedad a Tech Studios. De los documentos presentados en apoyo a la solicitud de sentencia sumaria, que forman parte del expediente de autos, surge que Tech Studios fue emplazado el 18 de junio de 1999. El contrato de compraventa entre Tech Studios y Mattei fue otorgado el 6 de julio de 1999 y presentado para inscripción en el Registro de la Propiedad el 12 de agosto de 1999.
De lo anterior podemos advertir que en el momento en que se otorgó la escritura de compraventa y la inscripción en el Registro, Tech Studios había advenido en conocimiento de la promesa de compraventa suscrita entre Artic y Mattei. Independientemente de que éste llevara realizando por un año o más transacciones dirigidas a adquirir los solares en controversia, lo cierto es que en el momento en que formalizó el contrato, ya conocía que existía una promesa de compraventa entre Artic y Mattei. La norma esbozada en el caso de Jordán v. Padró, supra, es que la tercería registral no ha de ser un subterfugio para el adquirente de un derecho viciado, que conocía de dicho vicio al suscribir el contrato. Así también, el Tribunal Supremo ha sido enfático en que no premiará la carrera al Registro o la operación de la tercería como una figura técnica, ignorando principios fundamentales de justicia.
En el momento que Artic exigió el cumplimiento específico de la promesa bilateral de compraventa, la propiedad aún pertenecía al Sr. Mattei, por lo que en dicha etapa era factible el cumplimiento específico de la promesa de compraventa. No incidió por ello el tribunal de instancia al determinar que dado los hechos específicos del caso, el contrato entre Tech Studios y Mattei era nulo por mediar una causa ilícita, la cual se *1118 refiere no tanto al contenido de las prestaciones del contrato, sino a las motivaciones en su otorgación. Véase al respecto, Reyes v. Jusino, 116 D.P.R. 275 (1985); Municipio de Ponce v. Autoridad de Carreteras, _ D.P.R. _, Op. del 29 de diciembre de 2000, 2001 J.T.S. 3. No se le debe otorgar legitimidad a una inscripción en el Registro realizada en contravención de los principios más fundamentales de la buena fe registral y contractual.
En cuanto a la imposición de responsabilidad solidaria entre Tech Studios y Mattei, debemos distinguir que bajo la doctrina de daños a tercero, el tercero, ajeno de la relación contractual, incurre en responsabilidad solidaria con el contratante que incumple su obligación de coincidir los requisitos enumerados en la jurisprudencia.
En su sentencia, el Tribunal de Primera Instancia concluyó que “...Suárez y Tech Studios actuaron dolosamente al interferir e impedir con sus actuaciones que se otorgasen [sic] la correspondiente escritura entre Artic-Kar y Mattei; éstos y Mattei son solidariamente responsables de los daños ocasionados a Artic-Kar, por el incumplimiento de Mattei. ... ”. Apéndice del Apelante, pág. 53. El Tribunal de Primera Instancia erró al concluir que Tech Studios le debe responder a Artic bajo la figura del contrato en daño de tercero. Entendemos que el tribunal de instancia no podía imputarle a Tech Studios que se confabuló con el Sr. Mattei para causarle daño a Artic porque de las declaraciones juradas, tanto del demandante como de Tech Studios, surge una clara controversia de hecho medular respecto a dicha intención. Como se sabe, el Tribunal Supremo ha sido consistente en advertir que "... no es aconsejable utilizar el mecanismo procesal de sentencia sumaria en casos donde hay elementos subjetivos. de_ intención, propósitos mentales o negligencia, o cuando el factor credibilidad sea esencial.” Soto v. Hotel Caribe Hilton, 137 D.P.R. 294, 301 (1994).
Aunque estimamos correcta la conclusión del Tribunal de Primera Instancia de que, en su día, el Sr. Mattei y Tech Studios deben responder por daños y perjuicios al demandante Artic, no podemos coincidir en que dicha controversia se dilucide por sentencia sumaria. Entendemos que la prueba sometida por la parte demandante en su moción de sentencia sumaria no estableció preponderantemente todos los elementos de la causa de acción de contrato en daño de tercero con respecto a Tech Studios. Mas bien, tal prueba puso en controversia la verdadera intención de Tech Studios al contratar con el Sr. Mattei, la cual tiene que ser dirimida en vista plenaria. En consecuencia de lo anterior, procede la modificación de la sentencia.
VI
Por los fundamentos antes expuestos, se modifica la sentencia parcial apelada en cuanto determinó —por sentencia sumaria— que el apelante Tech Studios le responde a Artic-Kar a tenor con la doctrina de contrato en daño de tercero. Se devuelve el caso al Tribunal de Primera Instancia para que celebre —a la mayor brevedad posible — , una vista evidenciaría en cuanto al aludido aspecto. Así, modificada, se confirma la misma.
Así lo acordó y manda el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General